IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DOCTORS FOR A HEALTHY MONTANA, a Montana Independent Committee, | CV 20–46–M–DLC |
| Plaintiff, | ORDER |
| vs. | |
| TIMOTHY FOX, in his official capacity as Attorney General of Montana; JEFFREY MANGAN, in his official capacity as Montana Commissioner of Political Practices, | |
| Defendants. | |

Plaintiff Doctors for a Healthy Montana (the "committee") brought this lawsuit on April 14, 2020, alleging that Montana Code Annotated § 13-37-210, which governs the naming of political action committees, is unconstitutional.  The Court previously denied the committee's motion for a preliminary injunction on the grounds that it had not "demonstrate[d] that [it] [was] likely to suffer irreparable injury in the absence of a preliminary injunction."  (Doc. 16 at 11 (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011)).)

The committee filed its motion for summary judgment (Doc. 17) before an answer or other responsive filing was due.  Defendants Timothy Fox and Jeffrey Mangan (collectively, the "State") filed their cross-motion for summary judgment

1

(Doc. 23) and, rather than an answer, a motion to strike portions of the Complaint under Rule 12(f) (Doc. 21).  The parties represent, and the Court agrees, that this matter is ripe for ruling on summary judgment.

The Court grants the committee's motion for summary judgment and denies that of the State.  It also denies as moot the State's motion to strike portions of the Complaint.  That said, the Court recognizes that the committee's verified complaint includes allegations which are unverifiable, nonfactual, and not appropriate for consideration in ruling on the cross-motions.[1]  Thus, it does not consider any such allegations in this Order.

**BACKGROUND**

## I.      The Statute & Its Interpretation

Montana Code Annotated § 13-37-210 provides that a political committee must "name and identify itself in its organizational statement using a name or phrase: (i) that clearly identifies the economic or special interest, if identifiable, of

---

[1] For example, the committee has "verified" that: "[i]n recent years, . . . the MTGOP has been infiltrated by those claiming to champion the Party's pro-life stand but, in reality, support taxpayer-funded abortions."  (Doc. 1 at 8.)  Among other notable turns of phrase, the committee also uses the term "abortion caucus" throughout its complaint and briefs to refer to a group of Republicans who reached across the aisle to expand Medicaid eligibility during the 2019 legislative sessions.  (Doc. 1 at 1, 9.)  The committee would do well to avoid over-the-top, naked political argument; the Court reminds the committee that, as the apolitical branch of our federal government, the Court should not be asked to trumpet ideologies or used to lend credibility and publicity to political actors.  That said, the Court does not analyze whether such allegations are "redundant, immaterial, impertinent, or scandalous" because it instead simply treats these opinions as opinions rather than facts and ignores them.  Fed. R. Civ. P. 12(f).

a majority of its contributors; and (ii) if a majority of its contributors share a common employer, that identifies the employer."  Mont. Code Ann. § 13-37-210(1)(a).  A committee must then "label any media advertisement or other paid public statement it makes or causes to be made in support of or opposition to any candidate or ballot issue by printing or broadcasting its name."  Mont. Code Ann. § 13-37-210(1)(b).

The office of Commissioner of Political Practices, created by the Montana Legislature in 1975, has oversight over alleged violations of § 13-37-210 and other election law statutes.  Mont. Code Ann. §§ 13-37-102, 13-37-111(1).  The Commissioner is nominated by a bipartisan group of legislators, appointed by the governor, and confirmed by the senate.  *Id.*  With certain exceptions, the Commissioner "is responsible for investigating all . . . alleged violations of the election laws" codified in Title 13, Chapter 35 of the Montana Code Annotated. Mont. Code Ann. § 13-37-111(1).  Upon completing the investigation, the Commissioner refers the matter to the relevant county attorney if he or she finds "sufficient evidence to justify a civil or criminal prosecution."  Mont. Code Ann. § 13-37-124(1).  In the event that the county attorney declines prosecution, the matter is referred back to the Commissioner for prosecution.  Mont. Code Ann. § 13-37-124(1).  Generally, penalties for campaign finance violations are equal to

3

the greater of $500 or three times the unlawful contribution or expenditure.  Mont.

Code Ann. § 13-3-128.

Interpretation of the statute is governed by a 1999 Advisory Opinion issued

by the Commissioner of Political Practices and by prior rulings addressing

complaints made under § 13-37-210.  *See* Mont. Comm'r of Political Practices,

Interpretation & Enforcement of Naming & Labeling Statute (1999),

http://politicalpractices.mt.gov/Portals/144/pdf/5cfp/2001opinions-naming_

labeling_statute.pdf.  Under the Advisory Opinion, "[d]eterminations of shared

economic or special interest [are] based on the 'name of the employer' and

'occupation' information provided by the contributor and listed in the political

committee's [finance] report."  *Id*.  Today, that self-reported employer and

occupation information is available to the public on the Campaign Electronic

Reporting System ("CERS") website at https://cers-ext.mt.gov.

The 1999 Advisory Opinion synthesized prior decisions parsing the statute.

Only one decision discussed in the Opinion involved a violation of § 13-37-210.

That violation was found when 55% of the contributors to "Montanans for

Common Sense Water Laws" were miners or mining companies.  *Id.*  On the other

hand, the Commissioner did not find a shared "economic or special interest" on the

basis of contributions made by: (1) attorneys who represented mining companies;

4

or (2) tire companies, equipment dealers, or other entities with a business relationship with the mining companies.  *Id.*

Similarly, no violation was found where all five of the contributors to "Committee to Defend First Amendment Rights" were businesses or had "business ties"—the contributors, two banking entities, a meat packing firm, the Montana Contractors Association, and an advertising agency, were found to not share an "economic or special interest."  And, in *In the Matter of the Complaint against the No on CA-30 Committee*, Nov. 15, 1996, the Commissioner decided that members of the Montana Board of Regents did not share a common economic or special interest in higher education, presumably because they were not paid for their work on behalf of the university system.  *Id.*

Because contributors come and go, a committee may be allowed—or even required—to change its name according to the jobs held by its contributors.  For example, one committee properly changed its name from "Montanans for Experienced Judges" to "Montanans and Lawyers for Experienced Judges" during a period in which only one of the six contributors to the committee was not a lawyer or a lawyers' group.  Mont. Comm'r of Political Practices, *Eaton v. Montanans for Experienced Judges*, at 4 (Oct. 13, 2016).  However, the committee was free to change its name back—and it did—when it gained eight new non-lawyer contributors.  *Id.*  The State represents that a committee may be assessed a

fine for only that period of time when it is noncompliant.  (Doc. 14 at at 2–3.)  *But see Eaton v. Montanans for Experienced Judges*, at 2 ("The naming and labeling review of employer and occupation information taken from the campaign finance reports is based on a review of all contributors, regardless of reporting period to the date of filing of the complaint.").

The statute is indifferent to the amount of money attributable to each contributor—it counts heads, not dollars.  Mont. Code. Ann. § 13-37-210.  Thus, as the Commissioner has noted, "[i]t is not uncommon for political committees, particularly those with [a] low number of contributors, to recruit small dollar contributors so as to avoid a majority of contributors from a single employer or an identifiable economic interest."  *Eaton v. Montanans for Experienced Judges*, at 4 n.6.  For example, a committee formed during the 2016 Montana Supreme Court election cycle, "stopsetemfreesandefur.com," had three contributors: the Republican State Leadership Committee gave $93,000 while two individuals contributed $85 each.  *Id.*  These two individual contributors formed a majority, "allowing a committee name other than the Republican State Leadership Committee."  *Id.*

## II.    Legislative History

As discussed in this Court's order denying the committee's motion for a preliminary injunction, § 13-37-210 "was passed without opposition in 1985 as a

6

'truth in labeling' measure, designed to prevent political action committees from misleading the public about their economic and special interests." *Doctors for a Healthy Montana*, __ F. Supp. 3d __, __, 2020 WL 2467269, at *1 (D. Mont. 2020).  The legislature was particularly concerned with misleading names chosen by dentists and denturists battling over a 1984 ballot initiative to allow licensed non-dentists to make and insert oral prosthetics.  *Id.*

During Montana's 2019 Legislative Session, Representative Jacob Bachmeier of Havre, Montana, sponsored House Bill 308, which would have repealed § 13-37-210.  Defendant and current Commissioner of Political Practices Jeff Mangan spoke in favor of repeal, testifying that the statute was difficult to enforce and obsolete in light of other disclosure requirements.  *Repeal Provision on Naming & Labeling of Political Committees: Hearing on HB 308*, 66th Leg. (Mont. Feb. 5, 2019), http://sg001-harmony.sliq.net/00309/Harmony/en/ PowerBrowser/PowerBrowserV2/20170221/-1/34957?agendaId=125018#info_.

No one testified in opposition to repeal.  *Id.*  House Bill 308 passed through committee, and the second reading of the bill passed, 51 to 49, on February 12, 2019.  The next day, Representative Fred Anderson of Great Falls, Montana, changed his vote, shifting the majority and killing the bill.

### III.   Factual & Procedural Background

Plaintiff Doctors for a Healthy Montana formed in February 2020 with the claimed goal of defeating in the 2020 primaries Republican legislators who voted in favor of Medicaid expansion.  (Doc. 1 at 2.)  At that time, the committee had received contributions of $35 from four individuals, only one of whom was a doctor, Dr. Annie Bukacek, and three of whom were Montana legislators.[2]  The committee was particularly interested in targeting Representative Joel Krautter of Montana House District 35, which covers Richland County, and it leased a billboard in Sydney, Montana opposing Krautter's reelection, proclaiming that he "voted for taxpayer funded abortions."[3]

Representative Krautter filed a complaint with Commissioner Mangan, alleging that the committee violated § 13-37-210 because a majority of its contributors were politicians.[4]  (Doc. 1-5.)  Commissioner Mangan sent a letter to

---

[2] Another physician donated $30.  Only contributors giving $30 or more are publicly disclosed. (Doc. 20-1 at 3.)

[3] Representative Krautter lost his primary.  Mont. Sec'y of State, *Official Election Results*, https://sosmt.gov/elections/results/.

[4] The committee repeatedly calls attention to Representative Joel Krautter's vote to repeal § 13-37-210, suggesting that Krautter and Commissioner Mangan are hypocrites for working toward repeal but then enforcing the statute.  (Doc. 1 at 2.)  Like many others of the committee's allegations, such contentions are likelier to erode its credibility than persuade, as they are irrelevant to the Court's consideration of this matter.  *See supra* n.1.  Moreover, the Court notes that Representative Matt Regier, a contributor to the committee now asking the Court to strike the statute as unconstitutional, voted against the repeal.  *See Repeal Provision on Naming & Labeling of Political Committees*, http://laws.leg.mt.gov/legprd/LAW0203W$BSRV.ActionQuery?P_SESS=20191&P_BLTP_BILL_TYP_CD=HB&P_BILL_NO=308&P_BILL_DFT_NO=&P_CHPT_NO=&Z_ACTION=Find&P_ENTY_ID_SEQ2=&P_SBJT_SBJ_CD=&P_ENTY_ID_SEQ=.

the committee, informing it that it had received a complaint and would investigate. (Doc. 1-6.)

The committee then filed this lawsuit, seeking injunctive and declaratory relief. (Doc. 1.) Since that time, additional contributors have given money to the committee, and the State has determined that, by late April 2020, a majority of the contributors were in fact doctors.[5] (Doc. 14 at 2–3.) Because the changed composition of the committee insulated it from further prosecution, the Court denied the committee's motion for a preliminary injunction.

The Commissioner has since issued a decision, noting that he "has limited discretion as to an unlawful campaign practice." (Doc. 20-1 at 6.) He found that the committee was out of compliance with § 13-37-210 from February 24, 2020 through April 19, 2020 and that a civil fine was therefore justified. (Doc. 20-1 at 6–7.)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

---

[5] The State's math appears to be somewhat fuzzy. (Doc. 20-1 at 6 (classifying "half (50%) of the committee's individual contributors, a larger share than any other single occupation" as a "majority".)

summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

The committee moves for summary judgment on the grounds that § 13-37-210 is a content-based restriction on speech, subject to strict scrutiny, which it fails.  (Doc. 18.)  For its part, the State asks the Court to grant its cross-motion because the statute is a disclosure requirement, which is examined under—and passes—exacting scrutiny.  (Doc. 25.)  Because the law cannot survive even under the lesser standard of exacting scrutiny, the Court does not resolve the question of whether the law is a content-based restriction or instead a disclosure requirement. Thus, it grants the committee's motion for summary judgment and denies the State's.

## I.    Applicable Framework

Made applicable to the states by the Fourteenth Amendment, the First Amendment prohibits laws "abridging the freedom of speech."  Protections are strongest for political speech, which "lies at the core of speech protected by the First Amendment, as it is the means by which citizens disseminate information, debate issues of public importance, and hold officials to account for their decisions in our democracy."  *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1111 (9th Cir. 2019).  Because "debate on the qualifications of candidates is

10

integral to the operation of the system of government established by our Constitution," *Eu v. S.F. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curium)) (brackets removed), "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Id.* (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271 (1971)).

Thus, laws limiting political speech are generally "'subject to strict scrutiny'—that is, they must be narrowly tailored to further a compelling government interest." *Nat'l Ass'n for Gun Rights*, 933 F.3d at 1112. But, even in the arena of political speech, the law recognizes that "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v. FEC*, 554 U.S. 724, 744 (2008). In other words, the government's interest in regulation may be more compelling where the regulated speech falls further from the First Amendment's core.

Unlike prohibitions on speech, regulations requiring disclosure increase the information available to the listener and impose a lesser burden on the speaker. "Disclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities' and 'do not prevent anyone from speaking.'" *Citizens United v. FEC*, 558 U.S. 310, 366 (2010) (quoting *Buckley*, 424 U.S. at 64; *McConnell v. FEC*, 540 U.S. 93, 201 (2003)). Such laws,

11

then, are subject to the less onerous but still heightened standard of "exacting

scrutiny." *Id.*; *Doe v. Reed*, 561 U.S. 186, 196 (2010).

Here, much of the parties' dispute hinges upon whether § 13-37-210 is a

restriction or instead a disclosure requirement.  The issue is close.  The statute has

characteristics of both disclosure requirements and content-based restrictions on

speech.

Disclosure requirements "only require[] [speakers] to provide somewhat

more information than they might otherwise be inclined to present."  *Zauderer v.*

*Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 650

(1985).  The D.C. Circuit has described the question of "whether a law is a

disclosure requirement or a ban on speech" as "simple": "does the law require the

speaker to provide more information to the audience than he otherwise would?"

*Pursuing America's Greatness v. FEC*, 831 F.3d 500, 507 (D.C. Cir. 2016).

However, that test as phrased could be passed by nearly any law compelling

informational speech, and such laws can nonetheless be "content-based

regulation[s] of speech," subject to strict scrutiny.  *Riley v. Nat'l Fed'n of the Blind*

*of N.C.*, 487 U.S. 781, 795 (1988); *see also id.* at 796–97 ("[The] difference

between compelled speech and compelled silence . . . is without constitutional

significance, for the First Amendment guarantees 'freedom of speech,' a term

necessarily comprising the decision of both what to say and what *not* to say.").

12

As this Court noted in *National Association for Gun Rights, Inc. v. Motl*, 188 F. Supp. 3d 1020, 1034 (D. Mont. 2016), "disclosures . . . are primarily categorized into two areas": (1) "clarifying the identity of the speaker in order to inform the public about 'who is speaking,'" *id.* (quoting *Yamada v. Snipes*, 786 F.3d 1182, 1197 (9th Cir. 2015)); and (2) "revealing the source and amount of political money," *id.* (citing *Buckley*, 424 U.S. at 66).  Here, the challenged statute arguably falls within both categories.  And it could be said that the statute merely requires the committee to give "somewhat more information" than it otherwise would by mandating that it disclose a profession shared by a majority of its contributors. *Zauderer*, 471 U.S. at 650.

That said, a statute limiting the names available to a committee—and at times, proscribing with some precision what that title should be—does hamper expression in a way that the typical disclosure regulation does not.  Naming is inherently expressive; a "title is a critical way for committees to attract support and spread their message." *Pursuing America's Greatness*, 831 F.3d at 507.  "The First Amendment protects [speakers'] right not only to advocate their cause but to select what they believe to be the most effective means for doing so." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).  More than simply requiring that a committee provide factual information, § 13-37-201 presents a mandate on how that information must be packaged to the public.

13

However, the Court need not resolve this issue in order to decide this case. *See, e.g.*, *Canyon Ferry Road Baptist Church v. Unsworth*, 556 F.3d 1021, 1031 (9th Cir. 2009); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 788 (9th Cir. 2006).  Regardless of whether the law imposes a content-based limitation on political speech or instead requires the disclosure of information to which listeners ought to be entitled, it fails.  Thus, the Court applies the lesser standard of exacting scrutiny.

Exacting scrutiny "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' government interest." *Citizens United*, 558 U.S. at 366–67 (quoting *Buckley*, 424 U.S. at 64.)  "To withstand this scrutiny, 'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Doe*, 561 U.S. at 196 (quoting *Davis*, 554 U.S. at 744).  Because "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment, . . . significant encroachments . . . cannot be justified by a mere showing of some legitimate governmental interest." *Buckley*, 424 U.S. at 64.  Instead, there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* (quoting *Pollard v. Roberts*, 283 F. Supp. 248, 257 (E.D. Ark.), *aff'd* 393 U.S. 14 (1968) (per curium)).

14

Here, although the State has a legitimate interest purportedly served by the statute, that interest is insufficiently served by the law.  Section 13-37-201 therefore fails under exacting scrutiny.

## II.   The Governmental Interest

"The governmental interests sought to be vindicated by . . . disclosure requirements . . . fall into three categories": (1) "provid[ing] the electorate with information as to where political campaign money comes from and how it is spent"; (2) "deter[ring] actual corruption and avoid[ing] the appearance of corruption"; and (3) "gathering the data necessary to detect violations of . . . contribution limitations." *Buckley*, 424 U.S. at 66–67 (quotation and citations omitted).  The State describes its interest as "[p]roviding the public with information about groups that spend in elections."  (Doc. 25 at 15.)  This interest falls into the first category identified in *Buckley*, as § 13-37-201 is designed to identify contributors and describe their interest in the speech, giving the listener information about the source of funding.

The committee responds that the State lacks a legitimate governmental interest in "forcing committees to adopt names reflecting the 'interests' of a majority of their contributors."  (Doc 18 at 9.)  But the committee's definition of the interest is merely an argumentative rephrasing of the statute itself, defining the State's interest at too low a level of generality.  Rather, the committee's argument

15

goes to the means used to promote the government's interest, and it is relevant to the second prong of the exacting scrutiny test.

The State argues, and the Court agrees, that it has a legitimate governmental interest in ensuring that voters are informed about the sources of spending on Montana elections. "Providing information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment." *Human Life of Wash. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010)). *See also Citizens United*, 558 U.S. at 368 (upholding disclaimer requirements that "provide the electorate with information and insure that the voters are fully informed about the person or group who is speaking") (quotation marks, citations, and brackets removed); *Cal. Pro-life Council, Inc. v. Getman*, 328 F.3d 1088, 1104–05 (9th Cir. 2003) ("The relevant interest is informational, and the district court could conclude on remand that this interest is sufficiently compelling to survive strict judicial scrutiny. . . . [B]eing able to evaluate who is doing the talking is of great importance.").

## III.   Substantial relation

The State contends that the statute "substantially relates to [its] informational purpose because it informs the voting public about whether a political committee's contributors share a common employer or are part of a special interest group." (Doc. 25 at 17.)  But that explanation is merely a

restatement of the statute itself.  The information that must be disclosed, and the manner in which it must be packaged, bears an insufficient relationship to the State's legitimate interest in ensuring that voters are made aware of the source of political spending.

Even under exacting scrutiny, "fit matters."  *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014).  What is required is "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective."  *Id.* (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)) (quotation and alterations omitted).

The State argues, and the Court agrees, that it was not required to choose "the least restrictive means" to further its informational interest.  *Id.*  But that the law is not as vulnerable to an overbreadth challenge as it would be under strict scrutiny does not translate to a de facto finding that the government's interest bears a substantial relation to the means chosen to enforce it.  *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011) ([I]f there are numerous and obvious less-burdensome alternatives to the restriction . . . , that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable.").

In this instance, "much of what [the State] wishes to accomplish . . . can be done through better fitting means." *Washington Post v. McManus*, 944 F.3d 506, 523 (4th Cir. 2019). And, in fact, the State has already implemented such measures. Information about donors is available to the public and the press on CERS, and it is widely used. For example, while this case was pending, the Montana Free Press published a story about Representative Krautter's primary, writing:

> Among the entities leveling attacks against Krautter this election cycle, according to political practices filings, is the Kalispell-based political action committee Doctors for a Healthy Montana, managed by Rep. Matt Regier, R-Columbia Falls, and Dr. Annie Bukacek, a vaccine-skeptic Flathead County Board of Health member who has questioned official COVID-19 death tolls to suggest that public health responses are designed to subjugate citizens. The committee, which describes itself as pro-life and claims Medicaid expansion has expanded abortion access, has reported spending against several Solutions Caucus Republicans in disputed GOP primaries including Krautter, Senate District 44 candidate Nancy Ballance and Rep. Eric Moore, who represents several rural counties in southeastern Montana.

Eric Dietrich, *Flanked from the Right*, Mont. Free Press, May 27, 2020. Montana's other disclosure requirements do much to "prevent[] the wolf from masquerading in sheep's clothing." *Cal. Pro-life Council, Inc.*, 328 F.3d at 1106 n.24.

Montana Code Annotated § 13-37-201 is simply not "a means narrowly tailored to achieve the desired objective" of providing information about who is financing campaign speech. *McCutcheon*, 572 U.S. at 218. Setting aside whether the Commissioner's interpretation of the statute is consistent with its plain terms,

*see infra* pp. 21–23, the State's informational interest is only minimally served—and, at times, frustrated—by the law.

Because the Commissioner looks only to a contributor's employer and job title (or, if the contributor is an entity, its industry and name), only a sliver of potential "economic and special interests" must be revealed in a committee's name.  And the statute is indifferent to the "not uncommon" situation in which a majority of a small number of contributors fall into a trustworthy group of individuals—for example, "citizens" or "schoolteachers" or "sportsmen"—even though the committee is funded almost entirely by a separate, potentially nonhuman entity.  *See Eaton v. Montanans for Experienced Judges*, at 4 n.6.  What is more, by its terms, the statute does not disallow a committee from using a title shared by a minority of its members, so long as there is not a majority that falls into another classification.

The facts of this case illuminate the problems with the statute.  "Doctors for a Healthy Montana" was a misleading name at the time that the Sidney billboard was leased, when three of five contributors were Montana legislators.  But the name arguably remains misleading, even now that the contributors have changed, as it suggests that the group comprises experts in healthcare targeting healthcare policy, when in reality the group describes its points of commonality as being "conservative Christians, strong supporters of the Second Amendment, and

champions of lower taxation and government regulation."  (Doc. 18 at 13.)

However, at no point can it be said that the name was factually incorrect—there

were always at least two doctor-contributors, even if one gave a *de minimis*

amount, and "Healthy Montana" is vague enough to never truly be false.

The poor fit between governmental interest and means of enforcement is

particularly concerning because the statute requires something more than a

standard disclosure.  *See Doe*, 561 U.S. at 196 (explaining that more is required of

the government where First Amendment rights are more heavily burdened).

Names are potent communications, and the State should not interfere with them if

such interference only sometimes furthers an important goal.  *Compare, e.g.*, *STOP*

*Hillary PAC v. FEC*, 166 F. Supp. 3d 643, 649–54 (E.D. Vir. 2015) (upholding

naming statute applicable only to a committee's registered title), *with Pursuing*

*America's Greatness*, 831 F.3d at 507–11 (holding regulation unconstitutional

when it extended application of the same naming statute beyond the context of the

committee's registered title).[6]

---

[6] 52 U.S.C. § 30102(e)(4), upheld in *STOP Hillary PAC*, 166 F. Supp. 3d 643, provides: "The name of each authorized committee shall include the name of the candidate who authorized such committee . . . .  "[A]ny political committee which is not an authorized committee . . . shall not include the name of any candidate in its name."  In *Pursuing America's Greatness*, the D.C. Circuit addressed 11 C.F.R. § 102.14, which extends § 30102(e)(4)'s ground rules to "any name under which a committee conducts activities, such as solicitations or other communications, including a special project name or other designation."  The court in *Pursuing America's Greatness* was careful to note that it was not determining the constitutionality of the statutory scheme but only the regulation extending the naming restriction to other projects, distinguishing *Common Cause v. FEC*, 842 F.2d 436 (D.C. Cir. 1988), and *Galliano v. U.S. Postal Service*, 836

Of course, the Court does not condone the practice of misleading voters through committee names.  Nor does not mean to suggest that all naming statutes are constitutionally infirm.  *See United States v. Harriss*, 347 U.S. 612, 625 (1954) (cautioning that "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal.").  The Supreme Court, too, has agreed that speakers should not be able to "hid[e] behind dubious and misleading names like: 'The Coalition—Americans Working for Real Change' (funded by business organizations opposed to organized labor; 'Citizens for Better Medicare' (funded by the pharmaceutical industry); 'Republicans for Clean Air' (funded by brothers Charles and Sam Wyly)."  *McConnell*, 540 U.S. at 196 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D.D.C. 2003) (per curium)); *see also id.* at 128.  However, the challenged statute is not a reasonable solution to the problem.

The committee also argues that § 13-37-210 is unconstitutionally vague.  (Doc. 18 at 12–13.)  It contends that the statute fails to define "economic or special

---

F.2d 1362 (D.C. Cir. 1988), which addressed only the statute governing registered titles.  831 F.3d at 508 n.4.  The D.C. Circuit determined that the regulation was a content-based restriction subject to strict scrutiny.

     On this point, the Court cannot make out a distinguishing principle; while the regulation imposes a higher burden on speech than the statute, the regulation is not, in any way, more targeted toward content-based speech when it applies the same restriction, nearly verbatim, and the only change is to the context in which the committee's name must appear.  However, synthesis of these cases is fairly straightforward if attention shifts to the "substantial relation" prong of the exacting scrutiny test.  Simply put, a lesser justification is required for the statute, which imposes a smaller burden on speech.

interest" and "offers no guidance on which . . . categories need[] to be reflected in the group's title."  (Doc. 18 at 12–13.)  The Court does not reach the committee's vagueness argument, but it notes that its criticisms on this point drive home why the statute fails under exacting scrutiny.  The committee would not be guilty of violating the statute under a commonsense reading—at least not for the same reason identified by the Commissioner.  The three legislators who once formed a majority of contributors do not "share a common employer" and "legislator" does not make sense, either logically or grammatically, as an "economic or special interest."  On the other hand, now that a majority of the contributors are doctors—although one is retired and another is apparently a doctor of physical therapy—the committee *must* use "doctors" in its name under the Commissioner's interpretation, even though, again, it is a challenge to conceive of "doctor" as an economic or specific interest.

Moreover, however strained the Commissioner's interpretation of the statute may be, the alternative would be for the Commissioner to determine on a case-by-case basis whether a majority of contributors shared an "economic or special interest" without further guidance from the legislature on the meaning of those terms.  It hardly requires saying that this solution would be cause for even greater alarm.  *See Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) ("When First Amendment freedoms are at stake, courts apply the

22

vagueness analysis more strictly, requiring statutes to provide a greater degree of specificity and clarity than would be necessary under ordinary due process principles.").

Accordingly, IT IS ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 17) is GRANTED.  Defendants' Motion for Summary Judgment (Doc. 23) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Strike (Doc. 21) is DENIED as moot.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment for the Plaintiffs and close this case.

DATED this 12th day of August, 2020.

Dana L. Christensen, District Judge
United States District Court